Case No. 24-7154. Cheryl Walker v. Uber Technologies, Inc., et al., Abelance. Mr. Huston, for the Abelance. Ms. Gleason, for the Abilene. Good morning, counsel. Mr. Huston, please proceed when you're ready. May it please the court, I'm Michael Huston of Perkins Coie for Uber. The district court's decision denying the motion to compel arbitration should be reversed for two independent reasons. Both are important. I hope we'll talk about both. First, contract law in the District of Columbia, as in virtually every state, uses an inquiry notice standard. A contract is formed so long as a reasonable person would have had an opportunity to view the terms before agreeing to them. That's the D.C. Court of Appeals in Forrest and this court in Selden. Uber's text message to Carol Walker provided that reasonable opportunity. Uber made no attempt to obscure or hide from Mr. Walker the fact that by agreeing to take this ride, he was required to agree to the contractual terms of use. On the contrary, we sent him a text message providing him the most critically important information about the services he was using, the car and driver that would be picking him up. And in that same message, even before that most important information, we Uber stated in plain, easy-to-understand language that by taking this ride, Mr. Walker would agree to the terms of use. A reasonable user of Uber's services would have read that text message, so it created inquiry notice of the contract as a matter of law. I think that your view of inquiry notice is pretty narrow. It seems that the law requires a fact-intensive, totality-of-the-circumstances approach, which goes beyond what you just said. You have to look at the course of conduct between the user and the business, and this user didn't have an Uber account or anything like that. You have to look at the type of transaction it is. We're not buying a house or a car. It's just a ride, things of that nature, and it seems to me that your analysis ignores a lot of other facts. The bottom line is this was an unfulfilled text that, you know, he may or may not have looked at, and he says he didn't, and is that enough to create inquiry notice under every circumstance? You're saying it is. You're saying we should just assume that any time Uber sends a text like this, there's a contract, and I find that difficult to accept. No, respectfully, Judge Penn, I don't think our position is saying that. I don't think we're saying any text message. Any text that says your ride is coming forms a contract to the rider, according to you. No, I think a contract was formed because this was the most direct communication that we had. But aren't you saying that any time Uber sends a text that says your ride is coming, a reasonable person would open that? I feel like that's the crux of your argument. In the context of— I think there's more to it. In the context—I think all the other—you're right that the inquiry notice standard takes account of the facts and circumstances. All of the other facts and circumstances here weigh in our favor. That's why the district court found that Mrs. Walker was found. That's why courts around the country have repeatedly found that the same kind of— If Uber sends a text that says your ride is coming, that forms a contract? No. Any reasonable person would open that app to see the terms and conditions. It doesn't boil down to that? No, it does not boil down to that. Okay. Under what circumstances would somebody receive that app and not be bound, not have inquiry? I think the point, Your Honor, is Mr. Walker cannot evade the— Can you answer my question? Under what circumstances would Uber send that app and there would not be inquiry notice? So I guess I'm not sure—I don't think Uber— In the context of Uber sending a message to a user about the ride that's coming to pick you up, about the services that you have requested, I think that is the best way for us as a company to get that information in front of the user.  So I'm just trying to understand your legal position. I read your legal position to say that any time Uber sends one of these texts, a reasonable person would open it, and they would have inquiry notice, and there would be a contract at that point. And I—you said, no, no, that's not it, and I'm asking you then, under what circumstances would Uber send that text and it would not form a contract? I think— There would be no inquiry notice. Let me try to clarify. Can you just answer that directly? Sure. I'm trying to—I want to clarify our position. I think when Uber sends this text message to a user and says, these are the details of the ride that's picking you up, and to accept that benefit, you must agree to the contract, that is reasonable. That's the— Any time they send a text, period. Yes. So there is no situation in which they would send a text and no contract was formed? Well, the user would have to decline. That would be when there's no contract formed. When the user says, I'm not willing to enter this bargain, I'm out. I don't want— No, no, no. I think you're assuming—your whole position is a reasonable person would open the—open the— Yes. That is correct. It is not commercial. Which means that any time you send a text, period, we're done. As long as the text is received, yes. Okay. Any time they receive it. Go ahead. What if they have a flip phone? So, Your Honor, Mr.—there's nothing in the record to suggest— What if they did? So, I still think that most flip phones are capable of receiving text messages. Most flip phones have connection to the Internet. So, I take it Uber prides itself on providing drivers quickly, right? That's the goal, obviously, is to send a driver as quickly as possible. So, if it's a minute and you have a flip phone, is there an upshot of the theory and you're a guest? I mean, I take—I understand the situation in which you're first subscribing for the service. That's kind of like being on a website. You got time. You can research it. You can do all this stuff. If you're the guest and Uber is doing its job really, really well, so the ride's going to be there within a minute, and you have a flip phone. And I take it Uber still has—I think it's the case that if you don't get in the car soon enough, the drive's gone. So, what in that situation? You have a minute and you have a flip phone. Chief Judge Schwernevossen, there's at least two reasons why Mr. Walker can't and didn't make that argument on this record. I mean, the first is he knows what kind of phone he had. He never attempted to argue. Can I just—I'm sorry. I totally understand where you're going, but in terms of the theory, in terms of your theory in response to Judge Pan, I'm just wondering, does your theory apply in that situation where the person, in fact, does have a flip phone and where the ride is coming in a minute? Yes, it would. It's not the record here, and I want to add one more note about why it's not the record, and then I promise I'll answer your question directly. The reason why it's not here is Mr. Walker, the record shows, had taken at least five rides before this one. So, even if there had been some question about whether—you know, that's more analogous to him signing up. He had that opportunity to review the terms in connection with his prior rides. This was not the first time he had used a— I think it's also part of the record that he didn't use texts. He says that, but that's—I think that's very important, Your Honor. That's what the case turned on for the district court and what my friend's argument hangs their head on. That is the classic example of an idiosyncratic subjective practice where this individual plaintiff says, I am the extraordinary person who, you know, at this time, in our age, does not use text messaging. I categorically refuse to read, and that's a subjective practice that cannot— I may have a follow-up about that, but let's get back to not the person who doesn't use text when they have a smartphone, but the person who doesn't have a smartphone. And Uber is coming in a minute. So, even if they don't have a smartphone, Your Honor, as long as they're capable of receiving text messages, they're going to get a message. And keep in mind, this is the message that tells you what car to get into. So, it's not like this is a message that you can conveniently ignore. Thanks to that, I mean, presumably the way this works is that the primary user can—and I think that's what happened here, but I could see it happening in other situations—the primary user can reach out to the guest and let them know what to look for. So, it doesn't seem crazy to me that a guest wouldn't have to—I take the point, you know, a lot of guests are going to look and verify and all that. I don't dispute that. But if you have a situation in which the guest has a flip phone, it's not easy to leaf through a contract, a multiple-page contract to find the arbitration clause, and they have a minute. And if the ride leaves, they're in the middle of nowhere, they're stuck for 25 more minutes. Uber's position is that they're bound to the terms of the contract that they were supposed to—how do they get it on the flip phone, by the way? I'm sorry. How do they get it on the flip phone? Well, even flip phones are capable of receiving text messages, Your Honor, most of them are. But I thought—how do they see the contract? Well, most flip phones still have a connection to the Internet. So I think the situation— So you can click on a link on a flip phone? Absolutely, Your Honor. As long as you have a connection to the Internet, yes. Well, I think most flip—I mean, maybe we're thinking about different kinds of flip phones, Your Honor, but I think a flip phone that you can buy today in a store is capable of receiving text messages, it's capable—it has a little, you know, trackpad where you can click on a hyperlink and it has an Internet browser. Most of them do. If you are the extraordinary minority of users who have a—you're using the Uber application, but you don't have a connection to the Internet, and again, we're talking about just the, you know, extreme, extreme minority. He's not using the Uber app. That's right, Your Honor, but he has— If you're using the Uber application. He has a phone, and— Yeah. That's right, he's not using the Uber application. But my point is, Mr. Walker knows if he is one of the extreme minority of Americans who has a flip phone that doesn't have a connection to the Internet or doesn't have the capability of receiving text messaging. He never made any of those arguments because I would be surprised if they were true. Let's suppose it's a flip phone with a connection to the Internet. Okay. Okay, so it's a flip phone with a connection to the Internet. I don't know how good the connection is, but it's a connection to the Internet. Let's just assume you're kind of out in the middle of nowhere, and you've got a minute. The ride's coming in a minute. Is it—is the reasonable—the reasonable person is someone who does what? Who reads the text message. That's all we'd ask you to do. That's all we're asking. No, no, you've got to do more than read the text message because you've got to read the attachment. You have to—when you—as soon as you read the text message, you know, if I want to take this ride, I'm going to have obligations that run in exchange for using the ride. If you click on that hyperlink within the very first few paragraphs, it's not buried. It's not the arbitration agreement. It doesn't appear like— If the obligation is done in a minute, and it doesn't surprise me that you couldn't do it in a minute. It's a lot to ask in a minute. Is the reasonable person supposed to say, I've got to—I'm passing up on the ride? I think if they feel strongly about that, Your Honor, if they're like, I'm not—I'm concerned about what these terms might say. I'm not comfortable taking this ride until I've had a chance to review. Then, yes, that's exactly what they're supposed to do as in every other situation. And again, I would just note, Mr. Walker can't make any of these arguments because he had used this same service multiple times before. He can't plausibly argue. He didn't have a full and fair opportunity to review these terms before he took this ride. It's also the case that Uber could have done more to make sure that a person who's in a guest situation is bound to the contract that it attaches. So, Your Honor, I think you respectfully—you could always say that. You could always say there's more we could imagine. Uber could have physically sent somebody with a clipboard to meet Mr. Walker to get his pending signature. But the standard under the District of Columbia contract formation law doesn't demand the most that Uber could possibly do. It asks, did Uber take steps that would allow a reasonably prudent user to know that there were contract terms? That is the standard in the District of Columbia. It is the standard in the overwhelming majority of other states. And that is—I think we am— Which has found contract formation under similar circumstances? So, I— Solicited text, no, like, actual membership with Uber or anything like that? Your Honor, yes, we absolutely do. But, I mean, I have to take issue respectfully with Your Honor's characterization of the text as unsolicited. The text came to him because it was solicited by his wife. I know, but by him, unsolicited by him. So, I mean, I guess I would just say it was— So, this is a fact-intensive inquiry, and you're trying to say that he was on inquiry notice. Yes. So, he gets a text that he, you know, didn't ask for, he didn't solicit, et cetera. Your Honor, if he's— He's relying on his wife to tell him what the car is. So, anyway, I know it's a reasonable person inquiry. I'm just asking you, what's your best case? I think that the cases like Hamilton from the Southern District of New York, cases like Hartenstein from this district court, cases like the Hilbert case decided recently by Judge Ali, all involve users who claimed, we didn't have actual notice. We didn't read the terms because I was blind, because I was in a hurry, because I didn't have my own account. I think you need to be a little bit more specific than that. So, there's not going to be a case, Your Honor, where a user said, I didn't have notice because I categorically don't read text messages sent to me by the companies that I'm transacting with. My point is, that's not a legally valid defense. I'm just asking you if you have a case that says all reasonable people open an unsolicited text under these circumstances. I think it is. I think you do. I do. Your Honor, if we're—can I come back to the unsolicited point? Because I think that's important. Can we confirm that you don't have a case that supports this theory that all people open texts under these circumstances? I think it is the only commercial—the standard is what is commercially reasonable. No, but it's a—as I keep mentioning, it's not just who would open the text. It's a fact-intensive inquiry, which goes into the relationship you have, the type of transaction it is, et cetera, et cetera, et cetera. And I'm just—I guess I'm asking you, I guess Uber's a big company. It has lots and lots of people using its app all over the country. Has any other court held that this is a contract that puts people on inquiry notice when you just send a text that says your car is coming? Yes, courts repeat. We cite—and the case is on page 27 of our brief. I think the Starkey case from the Second Circuit is— But are those people who were—who, I guess, downloaded the app, accepted the terms and conditions? Some are. Some are not. There are multiple cases involving guest riders, people who didn't themselves request the ride, who were nevertheless held to have notice. Just because they received the text that says your ride is coming? No, but— That's what I'm asking you. That's what I'm trying to zero in on. That's the crux of your argument, that that text that said your ride is coming, that is the inquiry notice. Is there any other case that said that that text is sufficient inquiry notice? I don't have a case that fits this exact fact pattern, Your Honor. Obviously, I would give it to you if I had. That's fine. That's what I was asking you. The reason why we don't have it is, I think, because there is almost nobody who would successfully make the argument that they are—they have an idiosyncratic, commercially unreasonable practice of ignoring all text messages. It doesn't have to be that. It's just they didn't open that text. That is—you're right. And so on that point, I didn't open it. That is an argument that we see all the time. And the courts— Can we zero in on that? Yes. Are there cases that say Uber sent the actual text that says your ride is coming now, and the client said didn't open it, but they were held to be an inquiry notice? Didn't—I'm sorry. When you say didn't open it, can I— Didn't open it. Didn't look at it. Didn't open a text message? No. There's not cases like that because, again, those are—nobody makes that argument that I just categorically refuse to open text messages. But I'm not saying categorically refuse. Just didn't on this occasion. They don't—no, people—I'm not aware of cases that fit that precise pattern, but I think it's a great example. But isn't that the crux of your argument, that you sending the text was enough? It doesn't matter what—how they react to it. You're saying in every situation, every reasonable person would open the text. Yes. Regardless of their relationship with Uber, how many times they've ridden, the size of this transaction, all the other factors that I think other cases— So what I'm saying, Your Honor, is in the context of this transaction, Uber, as a technology company, we're providing you services. We, as the company, are trying to tell you the car that is coming to pick you up. Here's the driver. Here's the license plate. I get that. I'm trying to understand, like, why that text is sufficient to form a contract. Because that's the—there is—a lot of the cases are focused on things like temporal proximity. When did you put the information in front of the user? Were you trying to obscure it or hide it, or were you trying to do your level best to get it in front of them? My point, Your Honor, is we clearly are in the position of trying to get this information in front of Mr. Walker. We want him to know that taking this ride is going to result in agreement—it requires agreement to the terms. And the reason why is because in the message where we're telling him when to get picked up— A reasonable rider might not know. If you're sending a text message that just says your driver will be here and here's his, like, license plate number, they're not—a reasonable person wouldn't think there's also going to be all this other information in here. I better click to find out, and therefore, you know, I will be bound. And when I enter the cab ride, I'm entering a contract. I just don't think that's reasonable. May I make two points, Your Honor? The first is the order. Before we get to telling you which car and driver is going to pick you up, the text message says, and by agreeing to this ride, you agree to these terms and conditions provided by that person. I'm saying something different, which is that I don't think a reasonable person would understand that they need to open that text in order to, before they enter the car ride, understand what the contract is that they're entering. Like, your argument seems to hinge on the fact that reasonable people always open this text, and so they're on inquiry notice of the contract because these tests always include those things. But reasonable people who are getting their Uber might not know that there's something on top of just getting the ride, that they're entering this whole contract with terms and conditions, et cetera, by getting into the car. I don't know that. Your Honor, a reasonable person using the Uber service needs to open that text message in order to know the ride that's picking them up. Apparently not, because some people have their spouses tell them. I don't think that's necessarily commercially reasonable behavior, but let me speak just directly to that for a moment, because the record also reflects, as we explained, that Mrs. Walker was told that she was required to provide Carol Walker's cell phone information, his phone number, and she was told, Mr. Gaddis testified in the record, that she was going to be, that Mr. Walker would be provided information about the terms of use. So if you were in the unusual situation where we're relying on the wife to provide the information about the license plate, we're also telling the wife, Mr. Walker needs to know about these terms of use that are going to govern the ride. So I just think that can't. I'll go ahead. If she doesn't pass that along, it's hard to say that he's bound. But that's, Your Honor, I think that's commercially unreasonable behavior. If we're telling her, here's all the information you need to know about this ride. You need to know the ride, the license plate and car that's picking you up, and you need to know about the terms of use that govern this ride. If she's choosing to only pass along half of that message to her husband, I don't think that that's commercially reasonable behavior. Well, that also applies. So I think one situation in which you can have a guest ride is where the person has lost their phone. I mean, we've all been in a bar or restaurant or something and misplaced our phone. We can't find the phone, so we can't call Uber. So someone else calls Uber on our behalf. And I think what you'd rely on in that situation, Your Honor, you would rely on the person calling, requesting the ride for you, to provide you with both, hey, what car am I looking for? What's the license plate? Is it a Toyota Camry that I need to know? And is there anything else I need to know? And the point is, whoever called that ride for you in that hypothetical situation, we told them, here's what you need to know about the license plate. So your theory would be there would be inquiry notice in a situation in which the guest doesn't have an Uber account, they lost their phone, so they can't get texts, but Uber, of course, has a communication with the primary user. That is taken as a given by everybody, I think, that the guest has inquiry notice even though they don't have a phone. Yes, because we have provided reasonable means for the user to know both the ride that's picking them up, the service they're getting, and the terms and obligations that govern their use of that services. May we talk about the third-party beneficiary argument? Before we get there, that's all you've done. Uber has set up a system here where someone can use the service without opening the text, without clicking on anything, just got in the car. And that's what happened here. It just ably got in the car. It's not required that you open the text. It's not required that you click on anything. It's not required that you look on your phone to use this service. You sure hope they will, but it's not required. So why is this not the equivalent of a BrowseRap? BrowseRap agreements, Your Honor, are not invalid under District of Columbia law, or the law of many other states. District of Columbia case has found inquiry notice for BrowseRap. I think Forrest is a pretty good example of that. That was a BrowseRap partner and person, what, didn't have the app, hadn't signed up for anything. No, this person did not have an account with Uber, which would have created the contract by itself regardless of the ride. I agree with you, Your Honor. All right. Forrest may be in that situation, someone who didn't have a pre-existing contract with the company, and simply the company sends them a text, but they don't look at it or whatever, or whatever form the information came from. But looking at that information is not a condition of accepting the service. So I think Forrest is an example of a BrowseRap agreement that was upheld by the District of Columbia. Under these circumstances where you don't have to click on anything, you don't have to, it doesn't even send like a read message back to the company. Nothing is done to show, nor is anything required of the individual with respect to that information to accept the service. Well, I think what's required of the individual, Your Honor, is to make the decision. No, I'm asking you about your Forrest case. I do not read that as holding as a matter of D.C. law, and we have to be sensitive here. We're not the experts on that. D.C. Court of Appeals is. All right. Inquiry notice is sufficient even if there's no requirement that the information be looked at, opened, read, received. No action is required from the customer whatsoever with respect to that information as a precondition of accepting the service. So a BrowseRap. Is that yes or no as to Forrest? I'm sorry. I'm genuinely unsure how to. If only Forrest covers the situation. I've told you the question I'm asking about. That's how I understand a BrowseRap. You don't have to do anything to accept the service. I'm very reluctant to correct, Your Honor, but respectfully, I just don't think that's what a BrowseRap is. A BrowseRap refers to a situation conventionally where a website says in order to sign up, you know, by signing up to use our service, you are agreeing to terms and conditions. And the courts that have looked at BrowseRaps. Signing up to receive our services, and then the person does something to sign up. Precisely, Your Honor. Precisely. That's not BrowseRap. BrowseRap does not require, that might be shrink wrap, but that is not BrowseRap, where you don't have to do actually anything. I mean, these are the, where nothing is required of the customer to accept the service. Nothing is required of the customer to accept the service. Information might be given to them, but nothing is required. Reading, accepting, clicking, nothing is required. And they can go forward and have the service just the same as anyone else could. Those are the BrowseRap agreements that have been flatly rejected by courts. No, respectfully, I don't think that that's quite right, Your Honor. What courts have said about BrowseRap. What was he required to do here that if he didn't do, he couldn't have gotten into that Uber? He was required to either accept the service or reject it. No, so the door was locked until, the door to the Uber was locked. He couldn't get in until he told the Uber driver, yes, I have received this message and clicked on the agreement. No, Your Honor. No, you don't make it a precondition. He got in this car without reading the text message or clicking on anything. He claims he got in without. That's the facts we have before us. He claims that he got into the car. That's the facts we have before us. Yes, Your Honor, but that. Do you have evidence that he did? No, Your Honor, but that is an example of an idiosyncratic, subjective practice. And it's a contract creation standard. That's the point, that you don't require anything from them. On JA-163, what does the word bounce mean? For these messages. On JA-163, Your Honor? Yes. What does the word bounce mean? I'm not certain. Well, this is about. I'm sorry, Your Honor, I don't know. Does that mean maybe it didn't even go through? Does your next pages show when things are completed? I don't even know. How do we know the calling went through? How do we know that the text message went through? If we don't know what this bounce, bounce, bounce, bounce means. Maybe this is something completely different. I just don't know what bounce means here. I'm not sure either, Your Honor. This wasn't a point of argument between the parties. It's a reasonable thing. No one has mentioned here what the district court found the factual basis for part of its decision, and that is the appearance of the message. All right? And the appearance of the message has what you all call the nuance stuff. I never knew about nuance stuff until I read this case. Maybe I'm unreasonable. I don't know. I look at this as something, if I've got a text that looks like this, with lots of dashes and I don't understand what it is, with lots of letters and numbers all put together, I'm going to remember my training from our computer team here, and I'm going to think it's spam. If we assume, I know you don't think that, but if you assume it looked like this, as the district court found what he called a mishmash of numbers and letters and other figures, and someone said, I don't have a number account. I know better than to click on things that look strange. That's one of the markers of spam or more vicious communications, harmful communications, is this mix of weird signals and things like that, where things are all squished together. So they thought it was spam. I look at this, I would have thought it was spam if it showed up like this. Put aside your argument as well. If it actually looked like this, would a reasonable person click on it? I'm going to say yes, Your Honor. Okay, so I'm unreasonable. I would look at that and I'd say spam. I would not click on something. I was announced for this message. I'm not an Uber subscriber. Your Honor, your spouse is named in the message, in the hypothetical, and your spouse is responsible. Of course, there's always information somehow relevant. That's how they get you in. I think respectfully, it would be a mistake. You have to win, given the district court's findings, your facts presented to the district court judge, and the district court's reliance on your factual evidence for making this decision. You have to show that any reasonable person who does not have an account with Uber, has not agreed to anything with Uber, and gets this text with just a few minutes before the car shows up, would click on that and put me in the category of unreasonable, then click on, or would open that up to read it, and then click on a link within it, the one thing you're just definitely not supposed to do when things look strange and you just ask for them, and then read it and understand 11 pages of legalese, and make that decision and understand I shouldn't get in the car unless I sign up to all this. That is the position you have to demonstrate to show. Judge Millett, respectfully, that is not what the record shows. May I ask you to look at page 93 of the JA? This is the Gaddis affidavit. This is the record evidence. This is paragraph 17. Now, you are right, and the district court focused on the fact that Mr. Gaddis, in paragraph 17, in the first sentence. Wait for me here. I've got to get to the right page here. JA 93, Your Honor. Yes. Yes. Okay, so you're right. In the first sentence, Mr. Gaddis explains the coding, but keep reading. Two sentences later, Mr. Gaddis explains. I'm in paragraph 17, Your Honor. Two paragraphs later, it's three lines up from the bottom of the paragraph. Mr. Gaddis explains in the record evidence that went to the district court how this text message looked. What did we say to Mr. Walker? The text message expressly stated that by taking this trip, you agree to the Uber terms of use and privacy policy. Yeah, but that was the district. So district court acknowledged that. We need to be fair to the district court here. But the district court said that sentence was buried in this mishmash of information here, and that's the problem. You can't get away from that. Your Honor, I think this is. So if Uber actually chose to send things out with all kinds of symbols and letters and numbers and things all put together and has a nice little link in the middle with one coherent sentence, then everybody is automatically bound by that, even if people concerned about spam from unsolicited text messages wouldn't click on it. Judge Millett, I think it would be a miscarriage of justice to decide this important case based on a factual misconception about how this text message looked.  It was the district court's misconception. I think that is quite unfair. Respect. That is quite unfair. This is the information. This was your evidence. Somebody may be messed up, but this was your evidence. The district court said, reproduced it line for line for line as presented in your evidence, all of it. Acknowledge what you said about the hyperlink. And you say, oh, Judge, silly Judge, you just said a misconception, a erroneous conception by the district court, Judge. You erred in taking us at our word and thinking we meant what we said. Your Honor, I think we attempted to tell that there was no factual dispute about this issue in the district court. We did not know. If we had known. You mean no factual dispute. You're right. That's exactly right. You put it in and said this is the message he received. You put it in. This is the message he received. Of course there's no factual dispute. Are district courts, do they engage in error and misconceptions when they accept as given evidence presented to them by a party? The plaintiff did. Do district courts err, engage in misconceptions when they accept as given the evidence presented to them by a party? Do they, yes or no? No, as a general matter. No, as a general matter. No, no, no, no, no, no. You don't, in general. Either they do or they don't. I don't think district courts can be faulted for relying on the evidence that the parties put forward. But I think the district court had an obligation to look at the entire paragraph 17 and under the party presentation.  He did. You cannot criticize our district court, Judge, for that. He recognized it. He said in his opinion, yeah, that hyperlink was in there. But that, the problem is the presentation. Your Honor, the question. And people have got a few minutes here. First they've got to figure out, what is this? Why do I, if they happen to look at all. And then they've got to look at it and go, what is this? Should I open it or not? I wouldn't. And then if they choose to, they've got to go navigate through this information that's unreadable and yet click on this link. And then they have to, on their phone, read 11 pages of single-spaced, fine print, full of legalese that never actually directly says. We could debate for a long time the legal proposition of whether the content of that document put him on immediate notice that he was agreeing to arbitration. So, you tell me. It's not enough to say any reasonable person would open a text message that looks like this and then go to the middle of it and click on a link when it's not necessary. I'm closing my phone, car shows up, and I get in, and nothing Uber has set up in this process that it designed requires any confirmatory or acknowledging action on my part. May I make two responses to that, Your Honor? The first is, I do want to talk about the important issue of the idea that the terms of use were 11 pages and that it was obscured. If Your Honor takes a look, as I know you will, at the record with the terms of use, you will see that the arbitration agreement is presented right up front. It is literally one of the first things that is presented. This is a JA-122. It is the paragraph that's in all caps and bold. That's not the most important point, though, but I think that the point there is just to say that anybody who opened up this terms of use and even just glanced at it in a little bit is going to see this bolded paragraph that says, you need to be aware that there's an arbitration agreement that's going to govern how disputes between you and Uber can be raised. We can do this, Yvonne. I've already looked at it. I don't think it's where this case falls on, but the services, all right? The service. I'm only agreeing to anything, a contact regarding the services, and then the services, where are they defined? We've got both of the pages. We get marketplace platform and services. That's about using the website. Third-party services and content, that applies to Ms. Walker. Access and use of the services, that's what you're going to, but it never talks about, it never says if you get in the car, if you're a third party. It never says if you're a third party. It requires inference about what these services are, and that gets back to what the district court talked about is even taking your reading. It's not clear. Your Honor, this is a really important point. Can I ask you to look at JA-123, please? It's about, it's under, within 2A. It's the third paragraph in there. This is the critical part of the arbitration clause. This arbitration agreement shall be binding on and shall include any claims brought by or against any third parties, including but not limited to your spouse's third-party beneficiaries. To the extent, it goes on to say, to the extent that any third-party beneficiary to this agreement brings claims against the parties, those claims shall also be subject to this arbitration agreement. I think that is a clear... In relation to your use of the services. Yes, and the services are the transportation services. Where's the definition? I'm sorry? Where's the definition? It's on JA-125 and 126. It's the definition of the marketplace platform and services, and it says that the services consist of the marketplace platform, the matching service, and that's providing a transportation service. That's what the app allows you to do, but he doesn't sign up for that. Your Honor, I think... He's downloading the app. Mr. Walker is clearly a user of the services that Uber is providing. Uber is providing the means for him to get connected to a transportation provider to get a ride. This is also why he is an intended third-party beneficiary. It's very important to talk about this argument because even if you disagree, or even if you agree with the district court's conclusion that he didn't have inquiry notice, he's still bound under both principles of third-party beneficiary law and estoppel. And I want to talk for a moment about that estoppel argument because... Let's go back to the third-party beneficiary thing. First of all, again, the reason we want to talk about this is because it's not crystal clear, at least to me. Maybe ultimately the contract would be interpreted the way you want it, but on a read by me in more than 10 minutes it took for his car to come, it's not crystal clear what happens here to people who don't actually have the Uber account and someone gets a ride for them. It's just not laid out. And it's not only laid out, it's omitted. There's talk about minors, right? But there is talk about adults in the agreement. I think that all you need to know in order to know that Mr. Walker was bound by the terms of this contract is that he was using Uber's transportation services that Uber is providing. And he clearly was. I think he understood what the services meant under this contract, not so locally, what they meant under this contract. I'm sorry, you wanted to talk about... Estoppel, Your Honor, because even if you don't find that he's a third-party beneficiary, so it's common legal... Do you agree that D.C. Court of Appeals law is crystal clear that third-party beneficiary is not as a basis for someone to sue you because they are part of the contract, but D.C. Court of Appeals has held that it doesn't work the other direction? I absolutely do not agree with that, Your Honor. That is my opponent's argument. I think it's quite wrong. I would urge the court to take a look at Judge Bozberg's decision in Hartenstein. What's our best case from the D.C. Court of Appeals? Yes, so I'm going to give you three. Fort Lincoln, Fairman, and Thorborn. These are all cases cited in Judge Bozberg's opinion in Hartenstein and Judge Bates' opinion in the O.M. case. That's O-E-H-M-E. These are both D.C., obviously, district court cases that are applying D.C. territorial law. They are citing Fort Lincoln, Fairman, and Thorborn. Now, the holding of those cases, and this is agreed between the parties. You can take a look at page 48 of the red brief where my opponent cites Thorborn, and they say exactly the same thing. Here's the legal standard that both parties agree on. A non-signatory is bound to arbitrate if he knowingly seeks and obtains the direct benefits from a contract, seeks to enforce the terms of a contract, or asserts claims that must be determined by reference to that contract. That's a quote. That's essentially the estoppel argument. Yes, it is. Okay, but that's different than third-party beneficiary. I asked you a third-party beneficiary question. So, Your Honor, I don't think that— Or do you want to do equitable estoppel? I do want to do estoppel. I want to do both, Your Honor. But can we—may I complete the estoppel point for just a moment? Okay. A non-signatory is bound where they assert claims that must be determined by reference to the contract. Again, that's a quote from the D.C. Court of Appeals, and Thorborn, my opponent, has it at page 48 of the red brief. That situation applies here. Why? Because of the complaint at JA33, paragraph 160K. Mr. Walker pleaded—he says that Uber— I'm sorry? Where is this in the J? JA33, Your Honor, paragraph 160K. So, Mr. Walker alleged in his complaint that Uber, through official communications— Your Honor, you don't need to read the whole paragraph to sort of get this, because it's broken up along multiple subparts, as you can see. But here's the allegation in the complaint. Here's the claim. Uber, through official communications, represented to their customers, including plaintiffs, including him, Mr. Walker, that Uber drivers are agents of the Uber defendants and that their care and skill are carefully vetted. So he is—and he says, I relied to my detriment on that. The only way for the court, the district court, to evaluate that claim is to turn to the official communications that Uber provided in the terms of use. Now, of course, the terms of use are going to actually turn out to— The estoppel argument isn't that contract might be one piece of evidence in a case. The estoppel argument is when someone sues on the contract. There is not a contract claim in this complaint. Your Honor— This subparagraph you've referenced to is under count three, negligence, apparent agency. Yes, but he's saying that the negligence was because he relied to his detriment on Uber's official communications. Those official communications occur in the contract. That's how we officially communicate. And also through advertising campaigns. Yes, also. He has other theories as well. But the point is there's no way to adjudicate this claim to know whether we as a company misrepresented the legal status of drivers. There's no way to know that without looking at the terms of use where we talk about the status of our drivers. And so it's precisely because Mr. Walker is here in one breath saying, I want to talk— I relied on Uber's official communications, meaning the terms of use. Because he wants to invoke that contract as a source of legal duty, he cannot turn around on that same hand and say, but I disclaim any obligations running the other way. That's the core principle of estoppel recognized under D.C. Court of Appeals. Do you have a case? Equitable estoppel has always been applied, as I've seen it, when someone is suing on the contract. That is a contract claim for relief. If you have a case from the D.C. Court of Appeals that says it's sufficient that the contract could be one of multiple sources of evidence for a tort claim, what's your best case? I have a case that says that where a party asserts claims that must be determined by reference to the contract, the contract binds them. That's the D.C. Court of Appeals decision in Thurber. What I read you is just a quote from that. So that's a tort case where they relied on a contract term, and then the contract binds them? I'm not sure off the—I can't remember off the top of my head whether it was a tort case, Your Honor. But keep in mind, these are general principles of contract law. This is not like an esoteric area of the law. The D.C. Court of Appeals has applied the restatement of contracts. But it wasn't a contract claim. I mean, I think the point is whether it was tort or not. It was not a contract claim? I'm not certain off the top of my head, Your Honor. I can't remember. But I know that the Hartenstein case, Judge Boasberg's decision, that's a decision against Uber. Judge Boasberg, in that opinion, is making the same essential point, and he's quoting the D.C. Circuit—the D.C. Court of Appeals decision in Thurber. So, again, I just think that's the application of a conventional contract law principle found in the restatement that multiple courts of appeals all around the country have accepted, as we explained in our brief, this idea that guest riders are bound. You're not breaking new ground. Indeed, for this court to reject that theory would be going overwhelmingly against the sort of the tide of cases that have addressed— In your brief, in your opening brief, but I'm not suggesting you completely waived it. Where did you cite to this paragraph? I'm sorry, where did we cite to which paragraph, Your Honor? Where did we cite to this 160K, subparagraph 160K? I'm not sure that we cited that particular paragraph, but we certainly made— Did you cite a particular part of the complaint as invoking a contractual argument? Yes. I'm quite confident, Your Honor, that we— What you're saying is you can't claim the benefits without the responsibility. We did make that argument. We also made the argument that you could not assert claims that needed to be decided by reference to the contract and then disclaim your obligations under the contract. That's in both our opening brief and in our reply brief when my friend said, you need to separate the difference between third-party beneficiary and estoppel. Of course, as we explained in the reply, there's multiple cases saying that's a really thin distinction. Any suggestion that this was waived below is, I think— That's not why I'm asking the question. I'm asking where you pointed to. Maybe you have other parts of the—is that your only part of the complaint that you think references? No, I don't think it's the only part. I'm just asking where those were argued to us in your brief. Your Honor, I don't have the briefs at the lectern, but I'd be more than happy to provide them on rebuttal. So, for this part of your argument, you're not relying on the notion that by accepting the benefits of a contract, you're bound to the contract. You're saying the plaintiffs did not just accept the benefits of the contract. They referred to the contract in the complaint. That's right. They're different arguments, Your Honor. I believe both are true. Certainly, as Your Honor is alluding to, we have forcefully argued that Mr. Walker accepted the benefits of the contract. He took the ride, and he did so knowingly, and he did so after Mrs. Walker was informed through the contract that she would have the opportunity to get services for third parties, and that third parties bringing any claims in connection with her use or their use of the services would also be subject to the same arbitration cost. That's the essence of the third-party beneficiary argument. Even if you don't have inquiry notice. Even if—that's exactly right, Your Honor. That's exactly correct. That is correct. So really, you have three independent reasons why Mr. Walker is bound. He's bound because he received inquiry notice through a text message that put a reasonable person on notice, and his idiosyncratic defense that he chooses not to read text messages does not defeat the objective standard. You have contract formation because he's a third-party beneficiary when he knowingly accepted the benefit of the services and knowledge through his wife's agreement that he was a third-party beneficiary who would be bound to arbitrate specifically. And third and finally, you have contract formation because he made arguments in the complaint that require referencing the contract, and he cannot simultaneously invoke that contract as a sword but say none of the other obligations on him apply. And all three of these theories would apply in all the factual scenarios that we've discussed, meaning regardless of whether you, in fact, happen to have a phone, regardless of whether the ride's coming in a minute, all three of these theories would apply. Your Honor, I'm not sure I can say that respectfully just because I think each theory turns on the factual record that you have. They all apply here, and I wouldn't ask them. I don't think the court should venture into saying this is, you know, how these contract formation principles would apply in all factual settings. I think all we've moved on— Not all factual settings, but the scope of the theory, obviously. I mean— Of course. Of course it matters to courts, and we've got to understand the rule that you're pressing upon us. And I think the only rule that we need—you know, the rule that Your Honor should pronounce is where a company like Uber takes steps to put a reasonably prudent user, to quote Judge Moss, on notice of the terms that are going to govern his or her use of a commercial service, a user who accepts those terms by their contract, which my friend agrees is a perfectly legitimate way of manifesting a sense under District of Columbia law, a person who accepts those terms is bound by the terms and cannot later claim that they have an idiosyncratic practice to categorically refuse to read the information that's presented to them. Let me make sure my colleagues don't have an additional question. Okay. Thank you, counsel. I'll give you a little time for about a second. Leighton. Good morning, Your Honors. May it please the Court, Shelby Leighton for Appalachia. Carol Walker has never downloaded an Uber app or had an Uber account. Despite that, Uber argues that by simply getting into an Uber called by his wife, Carol waived his right to a jury trial in court and must arbitrate his claims. The district court correctly rejected Uber's attempt to reshape basic principles of contract law. I'll start with the formation issue. Uber is essentially saying that a user can be bound to a contract based on a text message they didn't have to open, view, or interact with before getting in the Uber. In the online contract formation cases, courts engage in two levels of inquiry. The first inquiry is whether a reasonable consumer would have necessarily seen the reference to the terms while completing the transaction at issue. So, for example, if a consumer has to scroll to a different part of the page to see the terms that they don't need to scroll to to click a button or complete the transaction, courts have said that's insufficient to form a contract. Conversely, if the information is right next to the button that the user has to click and they must have necessarily seen that information while clicking the button, courts uphold that as sufficient notice. It's only then, once you determine what the consumer would have necessarily seen, that you look to whether the language and formatting of that information is sufficient to put the consumer on inquiry notice of what the actual terms of the contract are. And so if you apply those cases here, the threshold question is whether Carol would have necessarily seen the text message from Uber before he got in the Uber. And the answer to that is clearly no. Why is the test whether he necessarily would have seen it? Whether a reasonable third-party customer would see it. It's whether a reasonable person would have necessarily seen that as part of conducting the transaction. So in browser app cases, for example, like the SPECT case from the Second Circuit, which is one of the original browser app cases, the court looked at the fact that what the screen looks like to the consumer and whether a reasonable consumer would have necessarily known that there was a reference to terms somewhere on the page. And because they wouldn't have, because they would have had to scroll down to see that, the court said that was insufficient notice. And, you know, in the Marshall v. Georgetown case out of the Fourth Circuit, it was the same thing. So would the person have necessarily had to see the reference to the terms? No, they could complete the employment application and submit the application without ever looking at the terms. And so that's insufficient to provide notice. The same thing is true here. Carol or any reasonable consumer can get in the Uber and complete this transaction without ever having to see the terms. And what Uber could have done here is make it so that they did have to see the terms before they get in the Uber. Uber could have required them to reply to a text message or click on something in the text message in order for the Uber to be dispatched to them. It could have sent a PIN in a text message, which is what the companies did in some of the cases that Uber cites, where you would then give the PIN to the driver from the text message. And all of those things would require that the person actually has to open the text message and read the text message before they get in the Uber. Uber didn't do that here, and so you have a situation where a reasonable consumer is not necessarily going to see the text message before completing the transaction. And I think it's worth pointing out here that Uber knows how to do this because it did it with Carol. For people that have the Uber app, unlike Carol, it requires them, it has a blocking screen that says you can't order an Uber until you accept our update to our terms of service. So it knows how to make it a condition of the transaction, but it doesn't do that for guest riders here. Unless there are no more questions about this. If the text had just been a direct text, let's assume it was plain, readable text, and it just says, if you accept a ride from Uber, you are bound by our contract attached at this link. Would that be sufficient? No, I don't think that this turns on what the text says. The focus is on whether someone would need to open the text before taking the ride. So if you have the situation where the Uber is coming in one minute and your phone's in your pocket, you don't necessarily see the text at all. Or in the example where you've lost your phone, someone's calling an Uber for you. Again, you're not seeing the text at all, and Uber is not doing anything to require that you see the text. I don't think it is reasonable to expect that any consumer would necessarily have their phone out and be opening all their text messages in the few minutes before an Uber arrives. And the way to address that problem is to require them to do something with the text message before they get into the Uber. If there are no further questions on the formation point, I will... I don't understand the line between your argument and you arguing actual notice. You have to have actual notice before there's inquiry notice, and it's not clear to me that that's D.C. law. And yet it seems to me that your argument is requiring actual notice. They have to do something that you would only do if you saw the document itself. Check a box, send in a pin, whatever. Right. I mean, I think there's no question that inquiry notice is required here. But the question is when the inquiry notice... Before inquiry notice. Right. So, I mean, the definition of inquiry notice is that you have actual knowledge of circumstances that put you on notice to inquire further. So the actual notice thing is sort of baked into the inquiry notice standard. But I think, again, in these cases, there's this threshold in inquiry of what would a person have seen. And then there's the second question of assuming they saw that, would that have put them on inquiry notice of what the terms of the contract were? And so the threshold question, I think you can look at that threshold question as sort of an actual notice standard because it's essentially an evidentiary question. You don't need actual notice of the contract terms. I mean, I think that's the... Yeah. You don't need actual notice of the contract. We 100% agree that you don't need actual notice of the contract terms. The question is there's just two steps here that I think Uber is completing into one step. So once he's looking at the text message, the question is, is the language of the text message sufficient to put you on inquiry notice of what the actual terms of the contract are? But before you get to that question, you have to show that the person would have necessarily seen the text message that would then put them on inquiry notice of what the terms are. And that question, I think, is courts have treated it as somewhere between sort of an actual notice standard and like an inference of actual notice. So where courts, for example, if someone says, I don't remember seeing that language on the screen, but courts say, well, it was right next to the button you clicked. So we're going to assume that a reasonable person would see that and that, therefore, we're going to analyze the language and whether it put you on inquiry notice of the contract. So in—yeah, so I think that in this situation, you first have to look at would Carol have necessary—or would a reasonable person in Carol's situation have necessarily seen the text message despite him saying subjectively, I didn't see the text message? And the answer to that is no, they wouldn't have necessarily seen that, nor did Carol, in fact, see it himself. And because of that, you don't even get to this second step, which is did the language of the text message put someone on inquiry notice of what the terms of the contract actually were? So I can— Like his wife telling him, do most users—they can only know which car to get into by looking at the text message. Is that correct? I don't think that's correct, Your Honor. I mean, in this case, his wife told him, in many cases, you know, you have a situation where, you know, if you've lost your phone, you might be standing right next to the person who's calling the Uber for you. I think you could also just presume— Anytime someone's calling for you, you could rely on that person. Anytime someone's—you could rely on that person to tell you, which is this whole situation is just when someone's calling you an Uber. I think there's also just the inference that, like, if a car pulls up in front of you and stops and, like, said it's an Uber, you get—you know, they have the little Uber signs and stuff like that. I don't think you would necessarily need to know specific information about the car. You open the door and they say his last name, and you say, yes, that's me. Yeah, exactly, and I think it really—I think that depends on the circumstances, but it's certainly not the case that someone would necessarily need to look at that information. I mean, you think about calling a taxi or a car service, another type of car service, you don't necessarily get a text, but people sort of figure out how to identify it. So, yeah, and I think that even if a person could look at the text to get that information, the question is whether someone necessarily would need to look at the text before getting in the Uber. And, again, they don't—Uber has done nothing to make that required. I think the other thing that's important here, even if you're looking at a reasonable consumer's expectation, is that if you have someone else who has an Uber account, you know they have an Uber account and you know they've called an Uber for you, you expect them to be the one with a contract to Uber. You don't expect that, you know, you're—that you are being asked to contract with Uber. And, again, that—an example of that would be if, you know, I go out to dinner with my spouse and they make a reservation for us on OpenTable, I go to the restaurant, I don't think that I'm bound by OpenTable's terms just because my spouse is making us a reservation using their OpenTable account. And this is sort of the same thing where you're not expecting to be bound by a separate contract when someone who has a contract is doing the whole transaction. I can move on to the third-party beneficiary or non-segmentary enforcement. Can you address their effortless doppel argument that there's a reference to the contract and the complaint in a negligence count? Sure. So, first of all, you are correct that they only raise that in their reply brief. They don't raise that argument in their opening brief. And even in their reply brief— Do they cite to that provision of the complaint in their reply brief? They do cite to the complaint in their reply. But let's see. That's okay. We can figure it out later. Yeah. Sorry. I don't have it exactly. I know that they make a couple arguments based on the complaint in their reply brief. But, you know, first of all, in terms of that particular argument, the reference to official communications by Uber is not intended to refer to the contract. It is intended to refer to representations that Carol actually saw and that Cheryl actually saw. So, I don't know where they're getting the leap from official communications by Uber to the contract itself. But, certainly, his negligence claims do not require reference to the contract. But I think just that— Is the reference to the contract enough, for example, in the cases I've seen involve a suit on the contract? That's right. So, I think— Maybe it's broader than that in other jurisdictions or other cases. I think that it—I agree. I think it requires seeking to enforce some part of a contract. And I think you could have a situation—I think the reference to the contract is really referring to a situation in which maybe it's not a breach of contract claim, but it's centered around the contract. That's definitely not the case here. And, you know, as the court pointed out in the Ohm case— What is the source of legal duty here? The source of legal duty is common law duties, duties of care, not contractual duties. And, yeah, I think that it's a really important point because even the Ohm case that they cite recognizes that under all three of those different ways that you can have equitable estoppel, they all involve—most of the cases involve enforcing a contract or suing under a contract. And that's just not at all the case here. I also— Do you—if you have to sue under a contract, do you think then that equitable estoppel principles range more broadly than inquiry notice? If we're talking about a contract action anyway, then it seems like inquiry notice could naturally come up because we're talking about the contract. Then does equitable estoppel range—is the circle bigger than inquiry notice? I'm sorry. That makes sense. I don't know if I understand the question. So you're asking— So if— Does he have to—like, if he's going to rely on what it says in the contract, does he have to have inquiry notice of what's in the contract? Is that what you're asking? Right. In other words, if he brings a claim that's on the contract, which I think is your exchange with Judge Millett indicated was a precondition to reliance for the other side to rely on equitable estoppel. If we're in that land, then does the principle of equitable estoppel allow for holding the claimant to limitations in the contract even if inquiry notice isn't satisfied? Well, I think that's the big picture problem here is that he didn't form a contract, which is why he's not bringing a breach of contract claim. And it would be likely inconsistent for him to argue both that there was no contract and bring a breach of contract claim. And that comes up in these cases and is why maybe Uber is conflating third-party beneficiary and equitable estoppel is because in some of these cases what happens is that the person trying to enforce the contract has to argue that they're a third-party beneficiary of the contract so they can enforce it. And then the court is saying, well, now that you've done that, you brought a claim under the contract under a third-party beneficiary theory, you can't now avoid another part of the contract. That's not what's happening here. He is not arguing in any way that he can enforce this contract or that even the contract exists in the first place. And so this is different from those cases. But in any event, he's also not seeking to bring a claim that has any relation to this contract or, you know, I think the other point here is that he doesn't have any rights under this contract, even assuming that he could somehow enforce it. He, as a guest writer, is not mentioned in this contract at all. All the rights in the contract are about Cheryl. And so it cannot be that he's seeking to somehow benefit from a contractual right because he has no contractual rights in this situation. Make sure my colleagues don't have additional questions. Thank you. Thank you, counsel. Mr. Houston, we'll give you two minutes for our rebuttal. Thank you, Your Honor. A couple of points. Judge Millett, I promised I would tell you where in our opening brief we cited the various provisions of the complaint that we think give rise to estoppel. You can find that on pages 46 and 47 of our blue brief. It starts at the bottom of 46. It goes on to 47. You'll see multiple citations to multiple paragraphs of the complaint that we think require referencing the contract in order to adjudicate these claims.  Just help me here.  Is it 46 and 47? The bottom of 46. It goes on to 47, Your Honor. Most of it is on 47, including the key language that I quoted to you in my opening provision of the argument appearing at paragraph 160 of the complaint. You see that in the fourth line of page 47. So it's definitely in our opening brief. We also argued it in terms of both third-party beneficiary and estoppel in the district court. You can see that at page JA83. The inquiry— I'm sorry. Just give me a second here. You say that both Cheryl and he. This is about whether the driver is an employee? I'm sorry, Your Honor. I'm having a hard time hearing you. Sorry. This is—the first one is whether the driver is an employee of Uber or their agent. Right, but— And then— Whether they understood them to be—whether the plaintiff understood them to be their driver or agent, and that's the claim here. The plaintiff was saying, we were deceived by Uber about whether he was an agent, and that was because of the communications from Uber in the complaint. The third-party standard— But their duty isn't—does allege a duty to them, but that's—I mean, you referenced that, but it alleges that under D.C. law. Right, but I think, Your Honor, the duty that they're alleging here comes from the complaint. The only way Carol can allege that Uber owes him any duties at all is because of the contract that was formed between Cheryl and Uber. That is the source of any duties that he is alleging. That's the only reason he has any relationship whatsoever to Uber. And the point of the third-party beneficiary cases under the district's law is you cannot simultaneously— It's not relying on the contract necessarily if he took the ride. Like, what if my friend calls an Uber, and I just get in the Uber with them? I'm not a third-party beneficiary in the way that Mr. Carol is, but there's just a general duty of care. It's a negligence suit. But that gets the difference between the two strands, Your Honor. So when we're talking about estoppel, that does turn on the specific claims that Mr. Walker chose to plead. And I think what I'm saying and what we said at page 46 and 47 of our brief is, because he chose to plead claims that require, to use the words of the case law, reference to the contract, he cannot simultaneously disclaim the obligations under the contract. If he hadn't, if he had pleaded more narrowly along the lines of what Your Honor is suggesting, he would still be a third-party beneficiary under the clear terms of this contract because of the provision that I quoted to Judge Millett in the opening argument, where we clearly referenced third parties that are going to have access to the services through Cheryl's account. And we said, unambiguously, those third parties are going to be bound by the same arbitration clause. So do you have a case about this reference to the contract as opposed to a claim under the contract? Yes, I do, Your Honor. It's not Thubaran, is it? Because we can't see it in that. Or where in Thubaran are you seeing it? So I would urge the Court to take a look at the Ohm case, O-E-H-M-E. This is Judge Bates' decision. He's quoting here, a non-signatory may be bound to arbitrate if he or she knowingly seeks and obtains direct benefits from the contract, which Cheryl did, seeks to enforce the terms of that contract or asserts claims that must be determined by reference to the contract. That is the case law that we're applying here. Well, what is he citing? Because he's just a district court. He's quoting from a Fifth Circuit decision and also a Second Circuit decision. But again, he's talking—we're talking here about general principles of the restatement of contracts. No one has argued that the district's law doesn't follow the general principles. No, I understand. It's just that I think what we're all a little bit unsure about is whether the claim has to arise from enforcing the contract or whether it can just reference the contract. I understand. I don't think that's clear in the restatement. I understand that, Your Honor. I mean, I think respectfully, if that's where we get to in this case, it may be appropriate to certify it to the D.C. Court of Appeals if we ultimately, you know, if the Court ultimately thinks that this turns on what the D.C. contract law turns out to be. And if you find it to be an unsettled question, my reading of the D.C. Court of Appeals cases is that they apply restatement principles. And numerous courts, not only Judge Bates, but others, have applied these principles, both in the context of the estoppel argument and in the context of the third-party beneficiary. And again, that would be cases like Hilbert, Hartenstein, the Hamilton case from the Southern District of New York, all of which involve what you might call classic guest rider situations where somebody joins in an Uber ride. And the point is, you are knowingly using— Hartenstein, the third-party rider, downloaded the app. That's true, Your Honor, but that wasn't the basis of the court's decision. Hartenstein was trying to arbitrate. That's what the dispute was about. Understood, Your Honor. Under the terms of the contract. Hamilton, it was the reverse. Hamilton was a case where the agreement was being enforced against the rider, very much like this one. And again, I think—I mean, there are dozens and dozens of these cases. We cite numerous ones in our brief. Let me ask you a few. Because you pointed to paragraph 160, subsection K of the complaint. Is that—that's the one you pointed to as referencing the contract? That's not the only one, Your Honor. The others are noted at page 47 of our brief. I think that's the clearest one, but there are other paragraphs that reference the complaint as well. Well, I think trying to enforce language in the contract. I think they are saying language. I'm sorry. Am I saving some time here? If I just go—this is a long complaint. Lots of negligence counts and other court counts. If we found that one part of one count or a subpart of one count was, in fact, seeking to enforce the contract, does that mean the entire case, court case, has to get arbitrated or just that that one piece gets severed off for arbitration? It means the entire case has to go to arbitration. I'm sorry. What's your best authority for that? Well, I think that's the clear—I think that's the Supreme Court's case law on delegation clauses, which there is a delegation clause in this agreement. So as soon as you find that there was a contract formed, and destoppel is a means of creating a contract, Mr. Walker agreed to a delegation clause that says all issues of scope are delegated to the arbitrator. And as this court knows from the Supreme Court's multiple precedents on this topic, that really has to be rigorously enforced. So as long as we have a contract between—Mr. Walker is bound by the arbitration clause. The delegation clause will require all other scope issues to go to the arbitrator. Now, he might win. He might win that argument before the arbitrator and say, really, the only thing that should be before you, Mr. or Mrs. Arbitrator, is my claim that has reference to the contract. And I don't mean to correct, Your Honor, but it's not a claim seeking to enforce the contract that goes to arbitration. It's not just that. It's any claim that has to be decided by reference to the contract. That's when destoppel kicks in. So he might win that argument in front of the arbitrator. It's going to be the arbitrator that has to decide it. On the inquiry notice point, if I might just ask the court to take a look at your own decision in Selden. Here's what this court said is the inquiry notice standard because I know my friend spent some time debating that. And there's obviously a legal disagreement between us about what it is. It is not about actual notice, either of the contract terms, or even the notification prompt or the hyperlink. Inquiry notice, this is a quote from Selden, this court. Inquiry notice, also called constructive notice, so right there where you know it's not actual notice. Constructive notice turns on whether reasonable people in the position of the parties would have known about the terms and conduct that would be required to assent to them. Thank you. Thank you, counsel. Thank you to both counsel. We'll take this case, Henderson.
judges: Srinivasan; Millett; Pan